Davis *v.* Southern Farm Bureau Casualty Insurance Co.

5-1918                                    330 S. W. 2d 276

Opinion delivered November 16, 1959.

[Rehearing denied January 18, 1960]

*S. L. Richardson,* for appellant.

*James A. Robb* and *Robert H. Dudley,* for appellee.

Ed. F. McFaddin, Associate Justice. The question on this appeal is whether the plaintiff's complaint, together with the two amendments, stated a cause of action. The Trial Court sustained the defendant's demurrer and dismissed the cause when the plaintiff refused to plead further; and plaintiff has appealed. We will refer to the parties either by name, or as they were styled in the Trial Court.

The original complaint (filed August 2, 1958) alleged: that plaintiff, Ed. Davis, had a traffic mishap with another car owned by Bud Williams and both cars were damaged; that plaintiff's car was damaged $150.00 and Williams' car was damaged $205.86; that plaintiff had no insurance of any kind, but that Williams had both

public liability insurance and also insurance against collision damage (subject to $50.00 deduction) in the defendant, Southern Farm Bureau Casualty Insurance Company (hereinafter called "defendant").

The original complaint further alleged: that the defendant caused the Arkansas State Revenue Department to give notice to the plaintiff[1] that plaintiff's driving license would be revoked unless the plaintiff either (a) made cash deposit sufficient to cover the amount of damage, (b) gave bond to cover the damages, or (c) obtained a release from Williams; that plaintiff was financially unable to comply with either requirement (a) or (b), so plaintiff approached Williams and proposed the execution of mutual releases in compliance with Item (c) above; that Williams consulted the defendant as his insurance carrier, and ". . . the defendant willfully, maliciously, and intentionally, wrongfully interfered and persuaded, and forbade the said Williams from executing the promised release as aforesaid, and by reason thereof the said Bud Williams would not carry through and execute such release, and thereafter, . . . plaintiff's licenses aforesaid were revoked for such time until said revocation was withdrawn, which has not been done, . . ."

The original complaint further alleged that when Williams, on the advice of the defendant, refused to execute the release to Davis, the State revoked plaintiff's (Davis') driving license to plaintiff's damage in the sum of $400.00; and "That by reason of the defendant's said conduct, interference, persuasion, and forbidding, wilfully, maliciously, and intentionally so done, wrongfully causing the said Bud Williams not to execute the release, all as aforesaid, in clear violation of plaintiff's right under the law, resulting in the revocation of his said licenses and in his actual damage as aforesaid, defendant

---

[1] This notice was given pursuant to Act No. 347 of 1953, known as the "Motor-Vehicle Safety Responsibility Act", which may be found in § 75-1401 *et seq.* Ark. Stats. Particular attention is called to: § 75-1418 requiring report of accident; § 75-1424 on security following accident; and § 75-1425 on amount of security required.

is liable unto the plaintiff for punitive damages in the sum of $5,000.00 in addition to actual damages; . . ."

Plaintiff's first amendment to the complaint (filed September 20, 1958), alleged:

"That under the terms of said contract of insurance between defendant and the said Bud Williams, the defendant was subrogated to all the rights of the said Bud Williams, and it was the duty of the said insured, in the event a claim was made against the insured, covered by said insurance contract, to assist defendant in every manner in connection with said claim, and defendant would pay in settlement of such claim such sum as was agreed upon, if such agreement was reached, within the limits of said contract, and if a suit was brought on said action the defendant would defend same and would pay any judgment recovered thereon, within the limits of said contract; and, further, said contract provided that it was cancellable by either party at will upon giving five days notice of said cancellation, and said insured desired to keep said contract in force, and defendant was in a position to, and therefore did, in the manner and for the purpose and intent as aforesaid, cause said insured to refuse to execute said release, all as aforesaid."

Plaintiff's second amendment to the complaint (filed November 19, 1958) alleged:

"That on the 17th day of November, 1958, in Action No. 2621 in this Court between the said Bud Williams, as plaintiff, against the plaintiff herein, as defendant (Case No. 2621), wherein this plaintiff cross-complained and asked for damages to his automobile against Doyne Williams who was driving the said Williams car at the time of the collision, a trial of the issues were had by jury in which the verdict of the jury was that both the said Doyne Williams and this plaintiff were equally negligent and the jury allowed no recovery for either side in said Case No. 2621; . . ."

As aforesaid, the Trial Court sustained the defendant's demurrer and dismissed the complaint; and on this

appeal learned counsel for both sides have favored us with briefs which show tremendous study. We have concluded that the Trial Court was correct in its ruling.

I. *Williams Had The Absolute Right To Refuse To Execute Any Release To Davis.* When Davis asked Williams to execute a release and Williams refused, Davis had no cause of action against Williams, even if such refusal had been prompted by malice. This is true because a person has an absolute right to refuse to contract. There was no contract relation between Davis and Williams: Davis was merely proposing to Williams the execution of a contract; that is, a release or agreement not to sue. In Cooley on Torts, Fourth Edition, Vol. 2 § 224, the holdings are summarized in this language:

"It is a part of every man's **civil rights that he be** left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third persons have any legal concern."

In *Harding* v. *Ohio Casualty Ins. Company*, 230 Minn. 327, 41 N. W. 2d 818, the plaintiff sued the insurance company for withdrawing as a surety on his fidelity bond and the Minnesota court, in holding that the insurance company could withdraw, used this language:

". . . some rights are absolute in nature and may be exercised by a person acting singly without regard to his motive, even where it is malicious in the sense that it is done solely to cause harm to a third person. Of this sort, is the right to enter into contractual relations with another or to refuse to do so. *Hundley* v. *Louisville & NR. Co.*, 105 Ky. 162, 48 S. W. 429, 63 L. R. A. 289, 88 Am. St. Rep. 298; *H. D. Watts Co.* v. *American Bond & Mtg. Co. Inc.*, 267 Mass. 541, 166 N. E. 713, 84 A. L. R. 12; *McMaster* v. *Ford Motor Co.*, 122 S. C. 244, 115 S. E. 244, 29 A. L. R. 230; 30 Am. Jur., Interference, § 39."

In *McMaster* v. *Ford Motor Co.*, 122 S. C. 244, 115 S. E. 244, 29 A. L. R. 230, the Supreme Court of South Carolina used this language:

"But in refusing to deal with him they violated no legal right of his, since they owed him no such duty. The fundamental conception of a contract is that it is an agreement, and that implies mutual consent. Therefore the law allows one to determine for himself with whom he will contract; hence one may refuse to contract with another, or to buy or sell his goods, without incurring liability for resulting damage, even though his refusal be prompted by the intent to injure the other. Cooley, Torts, 278."

In *H. D. Watts Co.* v. *American Bond & Mortg. Co.*, 267 Mass. 541, 166 N. E. 713, 84 A. L. R. 12, the Supreme Judicial Court of Massachusetts used this language:

"A party not under contract with another has a right to refuse to enter into contractual relations with him, no matter what his motive for such refusal may be. 'Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases and on the best terms he can. . . . He may refuse to deal with any man or class of men'."

We are not here dealing with an interference bringing about the *breach* of a contract: we are dealing here with the refusal to contract. So it is clear that Williams had the absolute right to refuse to execute any release to Davis and would not have been liable, even if in so refusing Williams had acted with malice.

II. *The Defendant Insurance Company Was Subrogated To All The Rights Of Williams.* We have heretofore copied a portion of the first amendment to the complaint, which alleged: "That under the terms of said contract of insurance between defendant and the said Bud Williams, the defendant was subrogated to all the rights of the said Bud Williams, . . ." The original complaint alleged that Williams carried collision insurance with defendant, so this allegation in the first amend-

ment, when given its fair understanding, meant that the defendant had paid its obligations for the repair of Williams' car and, therefore, was "subrogated to all the rights of the said Bud Williams". The rule is well recognized that the person subrogated to the rights of another has all the rights of the original party. In 50 Am. Jur. page 752, "Subrogation" § 110, the holdings are summarized in this language:

"Subrogation contemplates full substitution and places the party subrogated in the shoes of the creditor. Generally speaking, the party subrogated acquires all the rights, securities, and remedies which the creditor has against the debtor who is primarily liable, . . . A subrogee, as just stated, occupies the position of the party for whom he is substituted, and succeeds to the same but no greater rights."

And in § 111 of the same article the text reads:

"Thus, the rule is well settled in fire insurance as well as in marine insurance that the insurer, upon paying to the assured the amount of a loss on the property insured, is subrogated in a corresponding amount to the assured's right of action against any other person responsible for the loss."[2]

The application of the quoted texts is exemplified in some of our cases. In *Boone County Bank* v. *Byrum*, 68 Ark. 71, 56 S. W. 532, the tax collector had deposited in a bank a portion of the taxes collected by him; and the bank, with notice of the trust, appropriated the money to the payment of the individual indebtedness of the collector. The sureties on the collector's bond, who paid

---

[2] In Blashfield's Cyclopedia of Automobile Law and Practice, Permanent Edition, Vol. 6 § 4181, the text reads: "While subrogation, strictly speaking, can logically arise only after a payment by the insurer of the claim for injury to or loss of the automobile, still an additional and supplementary rule exists, even where the policy expressly mentions subrogation and provides for its effectuation by assignment of the insured's claim against the wrongdoer to the insurer upon or after payment by the latter, that any payment as damages received by the insured from the wrongdoer before settlement with the insurer, reduces by operation of law the liability of the insurer *pro tanto*, and where the insured releases his right of action against the wrongdoer before settlement with the insurer, that release destroys, by operation of law, his right of action on the policy.

the State the amount misappropriated by the collector, were held entitled to be subrogated to the rights of the State as against the bank. In *Myers Bros. Drug Co.* v. *Davis,* 68 Ark. 112, 56 S. W. 788, judgment was recovered against the constable and the sureties on his bond for wrongful seizure and sale of property under process; and the judgment was paid by the sureties. The constable died insolvent, and the sureties were held to be subrogated to the rights of the constable to sue on the note given for the purchase price of the property sold under process. In *Carroll County Bank* v. *Rhodes,* 69 Ark. 43, 63 S. W. 68, the sureties on a collector's bond who paid the State the amount of money misappropriated by the collector were held subrogated to the State's right of recourse against the party knowingly receiving the misappropriated money.

The defendant, Southern Farm Bureau Casualty Insurance Company, as a paid surety, was entitled to the same right of subrogation as were the sureties in the adjudicated cases. So the defendant insurance company, subrogated to all the rights of Williams, could with impunity refuse to contract with Davis, just as Williams could. In short, the refusal of the defendant insurance company to allow its insured (Williams) to contract with Davis was a right of refusal to contract which gave Davis no cause of action against Williams or the defendant insurance company as Williams' subrogee.

Affirmed.